**Lansing, Michigan**

# Opinion

Chief Justice:          Justices:
Marilyn Kelly          Michael F. Cavanagh
                       Maura D. Corrigan
                       Robert P. Young, Jr.
                       Stephen J. Markman
                       Diane M. Hathaway
                       Alton Thomas Davis

FILED DECEMBER 29, 2010

STATE OF MICHIGAN

SUPREME COURT

ANGLERS OF THE AuSABLE, INC.,
MAYER FAMILY INVESTMENTS, LLC,
and NANCY A. FORCIER TRUST,

Plaintiffs-Appellants,

v                                          Nos. 138863 to 138866

DEPARTMENT OF ENVIRONMENTAL
QUALITY, DIRECTOR OF THE
DEPARTMENT OF ENVIRONMENTAL
QUALITY, and MERIT ENERGY
COMPANY,

Defendants-Appellees.

BEFORE THE ENTIRE BENCH

DAVIS, J.

In this case we determine whether defendant Merit Energy Company's plan to

discharge contaminated water from an environmental cleanup site in the Manistee River

watershed into a previously unpolluted site in the AuSable River watershed is an

allowable use of water. We also determine in this case whether the Michigan Department

of Environmental Quality (DEQ) (which is now the Department of Natural Resources and Environment) can be sustained as a defendant in an action brought under the Michigan environmental protection act (MEPA), MCL 324.1701 *et seq.*, when the DEQ is alleged to have authorized activity that will harm the environment.

We hold that Merit's discharge plan is not an allowable use of water because it is manifestly unreasonable, and we further hold that the DEQ can be sustained as a defendant in a MEPA action when the DEQ has issued a permit for activity that it is alleged will cause environmental harm. Accordingly, we reverse the Court of Appeals' judgment in part and remand the case for reinstatement of the trial court's decision holding the DEQ accountable for violating MEPA.

## I. FACTS AND PROCEDURAL HISTORY

This case arises out of Merit's proposed plan to discharge treated, but still partially contaminated, water from the Manistee River watershed into the AuSable River water system in an effort to clean a plume of contaminated groundwater.

In 2004, Merit acquired the Hayes 22 Central Production Facility (CPF) located in Otsego County, Michigan. As a condition to purchasing the CPF, Merit entered into a settlement agreement with the DEQ to remediate the plume of contaminated groundwater that had originated from the CPF.

The exact size of the plume, which at the time was continuing to expand, is unknown. The plume contains benzene, toluene, ethylbenzene, and xylenes and chlorides contained in brine, among other contaminants. The plume is known to have

2

contaminated several residential drinking wells and may have contaminated other residential wells as it continued to expand.

Merit evaluated a number of options for remediation and ultimately chose air stripping—a process that forces a stream of air through water, causing hydrocarbons to evaporate.[1] Merit submitted a corrective action plan to the DEQ to remediate 1.15 million gallons of plume water a day through the use of air stripping.

The plan was to send the 1.15 million gallons a day through a 1.3-mile pipeline from the air-stripping site to be discharged into Kolke Creek. Kolke Creek forms the headwater system for the AuSable River watershed. Kolke Creek feeds into Bradford Creek, Lynn Lake, and the AuSable River.[2]

The DEQ approved Merit's corrective action plan and issued a general permit and certificate of coverage allowing discharge of treated water from the air stripper into the wetland area flowing into Kolke Creek. The DEQ also granted Merit an easement through state-owned land to allow Merit to construct the pipeline from the air stripper to the discharge point.

---

[1] The air-stripping process does not remove any brines or chlorides from the water. Thus, although the water is cleaner at discharge than when it was first removed from the ground at the CPF, the water remains contaminated in some respects.

[2] The plaintiffs in this case are either riparian owners along these waterways or users of the waterways for recreational purposes such as fishing. The waterways are considered prime trout-fishing locations because of their purity and mineral content.

Plaintiffs filed a complaint against Merit and the DEQ in the Otsego County Circuit Court. Plaintiffs alleged violations of surface-water law, riparian law, and MEPA. Plaintiffs sought an injunction against the discharge plan.

After a bench trial on plaintiffs' complaint, the trial court issued an opinion and injunction preventing Merit from discharging the air-stripped water into Kolke Creek. The court made detailed findings of fact and concluded that the proposed discharge plan would severely harm the AuSable River water system because of the increased flow of water and the increased level of substances not previously found in Kolke Creek.[3] It applied the "reasonable use balancing test" from *Mich Citizens for Water Conservation v Nestlé Waters North America Inc*, 269 Mich App 25; 709 NW2d 174 (2005).

In applying the reasonable-use balancing test from *Nestlé*, the trial court concluded that Merit's proposed amount of discharge constituted an unreasonable use. The court ruled that the proposed discharge, and the DEQ's authorization of the discharge, violated MEPA. However, in its injunction preventing the discharge, the court left open the possibility that Merit could discharge treated water into Kolke Creek at a lower rate that might be considered reasonable under the reasonable-use balancing test.[4]

---

[3] The trial court also made findings about whether Merit had properly obtained rights to discharge the treated water through the state-land easement. However, because we do not find those issues to be outcome-determinative in this appeal, we will not address them in this opinion.

[4] Merit contends that this case is now moot because it has abandoned the Kolke Creek discharge plan and is instead treating the CPF contamination plume through another method. However, as correctly argued by the plaintiffs, the trial court has left open the door for Merit to discharge treated water into Kolke Creek at a lower than originally

All parties appealed in the Court of Appeals. In a unanimous opinion, the Court of Appeals affirmed the trial court's decision regarding the reasonableness of Merit's proposed discharge plan. *Anglers of the AuSable, Inc v Dep't of Environmental Quality*, 283 Mich App 115; 770 NW2d 359 (2009). The Court applied the reasonable-use balancing test and noted that the trial court had left open the possibility that Merit could discharge treated water at a lower, more reasonable rate. *Id*. at 136-137. The Court of Appeals also unanimously dismissed the DEQ as a defendant, applying this Court's precedent from *Preserve the Dunes, Inc v Dep't of Environmental Quality*, 471 Mich 508; 684 NW2d 847 (2004).

Plaintiffs sought leave to appeal in this Court. We granted leave to appeal, asking the parties to discuss, among other issues, whether *Mich Citizens for Water Conservation v Nestlé Waters North America Inc*, 479 Mich 280; 737 NW2d 447 (2007), and *Preserve the Dunes* were correctly decided.[5]

## II. STANDARD OF REVIEW

We review a trial court's factual findings for clear error and its legal conclusions de novo. *Hendee v Putnam Twp*, 486 Mich 556, 566; 786 NW2d 521 (2010). Whether this Court's decision in a previous case should be overruled is a question of law that this Court reviews de novo. *Bush v Shabahang*, 484 Mich 156, 164; 772 NW2d 272 (2009).

---

proposed rate. Because there is still a court order keeping the Kolke Creek discharge plan alive, we cannot treat this case as moot.

[5] *Anglers of the AuSable, Inc v Dep't of Environmental Quality*, 485 Mich 1067 (2010).

5

III. ANALYSIS

A. *PRESERVE THE DUNES v DEP'T OF ENVIRONMENTAL QUALITY*

In our order granting leave to appeal, we asked the parties to address whether this Court's opinion in *Preserve the Dunes* was correctly decided. After further review of the *Preserve the Dunes* decision, we conclude that it was decided incorrectly and, accordingly, we overrule it.

*Preserve the Dunes* involved a group of citizens suing the DEQ for authorizing a permit for a sand dune mining operation[6] in violation of the sand dune mining act (SDMA). MCL 324.63701 *et seq*. The dune that was to be mined had previously been designated as a protected dune that could not be mined unless one of two exceptions contained in the SDMA applied. The two exceptions were not applicable in that case; therefore, the DEQ's permit allowing the mining operation on the protected dune violated the law.

The concerned citizens in that case filed a lawsuit against the DEQ under MEPA to protect "the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction." MCL 324.1701(1). The majority in *Preserve the Dunes* held that reviewing the DEQ's permit decisions was outside the judicial authority under MEPA. *Preserve the Dunes*, 471 Mich at 519. The majority noted that MEPA provides for a private cause of action regarding damage to the

_____

[6] The mining operation was also sued, but the focus relevant to this case is the suit against the DEQ.

6

environment. *Id*. at 516. The majority stated that the DEQ's permit application review was based on technical aspects of the application process, and not damage to the environment itself. *Id*. at 519. The Court concluded that even if violation of the technical aspects of the application process resulted in environmental damage, that level of causation was not grounds for a private cause of action. The Court stated that the permit process was "unrelated" to any subsequent environmental harm caused by the permitted action. *Id*.

The *Preserve the Dunes* dissent correctly concluded that the majority's holding "that permit eligibility is unrelated to whether the conduct permitted will harm the environment is untenable."[7] Without a permit from the DEQ, a party such as the mining operator in *Preserve the Dunes* or Merit in the instant case lacks the authority to commence the conduct that will harm the environment. The permit from the DEQ serves as the trigger for the environmental harm to occur. The permit process is entirely related to the environmental harm that flows from an improvidently granted, or unlawful, permit.

Before a majority of this Court decided *Preserve the Dunes*, this Court had previously decided other cases in which a permit application had been the subject of a MEPA action. Until *Preserve the Dunes*, this Court had never ruled that a permit decision was insulated from a MEPA action.[8] The majority's decision in *Preserve the*

---

[7] *Id*. at 533-534 (KELLY, J., dissenting).

[8] See, e.g., *Eyde v Michigan*, 393 Mich 453, 454; 225 NW2d 1 (1975), *Ray v Mason Co Drain Comm'r*, 393 Mich 294, 304-305; 224 NW2d 883 (1975), *West Mich Environmental Action Council v Natural Resources Comm*, 405 Mich 741, 751; 275

*Dunes* frustrated the legislative intent behind MEPA, and it represented a departure from this Court's precedent. As the *Preserve the Dunes* dissent noted:

> MEPA is intended to prevent conduct that is likely to harm the environment as well as to stop conduct that is presently harming it. In *WMEAC* [*West Mich Environmental Action Council v Natural Resources Comm*, 405 Mich 741; 275 NW2d 538 (1979)], this Court ordered that a permanent injunction be entered prohibiting the drilling of oil and gas wells pursuant to a DNR permit. The "issuance of permits was properly before the circuit court as conduct alleged to be likely to pollute, impair, or destroy" natural resources under MEPA. *WMEAC* at 751. The drilling would cause "apparently serious and lasting, though unquantifiable, damage" to elk herd population. *WMEAC* at 760. This Court concluded that the previous MEPA, MCL 691.1203(1), is violated whenever the effects of permit issuance harm the environment to the requisite degree. *WMEAC* at 751, 760. [*Preserve the Dunes*, 471 Mich at 534 (KELLY, J., dissenting).]

Because the *Preserve the Dunes* opinion violated the legislative intent behind MEPA, and because the opinion conflicted with this Court's caselaw that came before it, we hold that *Preserve the Dunes* was incorrectly decided to the extent that it insulated the DEQ's permit application process from review under MEPA.

There are further compelling justifications for overruling *Preserve the Dunes*. The first is that MEPA is a statute that was enacted as part of the environmental protection mandate to the Legislature contained in Article 4, § 52 of Michigan's Constitution. In *Ray v Mason Co Drain Comm'r*, 393 Mich 294, 304-306; 224 NW2d 883 (1975), this Court stated:

> Michigan's Environmental Protection Act marks the Legislature's response to our constitutional commitment to the "conservation and

---

NW2d 538 (1979), and *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16; 576 NW2d 641 (1998).

development of the natural resources of the state . . ."  Const 1963, art 4, § 52 in its entirety reads:

"Section 52. The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people.  *The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction.*"  (Emphasis added.)

Michigan's EPA was the first legislation of its kind and has attracted worldwide attention.  The act also has served as a model for other states in formulating environmental legislation.  The enactment of the EPA signals a dramatic change from the practice where the important task of environmental law enforcement was left to administrative agencies without the opportunity for participation by individuals or groups of citizens.  Not every public agency proved to be diligent and dedicated defenders of the environment.  The EPA has provided a sizable share of the initiative for environmental law enforcement for that segment of society most directly affected—the public.

The act provides private individuals and other legal entities with standing to maintain actions in the circuit courts for declaratory and other equitable relief against anyone "for the protection of the air, water and other natural resources and the public trust therein from pollution, impairment or destruction".  MCLA 691.1202(1); MSA 14.528(202)(1).

\* \* \*

But the EPA does more than give standing to the public and grant equitable powers to the circuit courts, *it also imposes a duty on individuals and organizations both in the public and private sectors to prevent or minimize degradation of the environment which is caused or is likely to be caused by their activities.*  [Emphasis added and citations omitted.]

The majority's decision in *Preserve the Dunes* not only violated the Legislature's intent to protect the environment encapsulated in MEPA, it subverted the people's will as expressed in Michigan's constitutional requirement that the Legislature "shall" protect the environment.

9

Another compelling reason for overruling *Preserve the Dunes* is that it appears from the instant case that the DEQ has done more than simply issue a permit that would result in the harm of natural resources. It has also granted an easement over state land to facilitate the harmful actions. Under *Preserve the Dunes*, the DEQ cannot be required to account for its actions. By overruling *Preserve the Dunes*, this Court can restore the accountability that was intended under MEPA.

Because the *Preserve the Dunes* decision to insulate DEQ permit decisions from MEPA violated the Legislative intent behind MEPA, conflicted with previous caselaw regarding MEPA, and subverted the will of the people contained in article 4 of Michigan's constitution, we overrule it.[9]

## B. *NESTLÉ* AND STANDING

In the order granting leave to appeal, we also asked the parties to brief whether *Nestlé* was correctly decided.[10] However, *Nestlé* has already been overruled in part.

_____

[9] We do not overrule *Preserve the Dunes* without proper consideration of the principle of stare decisis. The approach taken to stare decisis in any given case will be dependent on the facts and circumstances presented. See *Planned Parenthood of Southeastern Pennsylvania v Casey*, 505 US 833, 854-855; 112 S Ct 2791; 120 L Ed 2d 674 (1992). Historically, many different approaches to stare decisis have been taken. See *Petersen v Magna Corp*, 484 Mich 300; 773 NW2d 564 (2009); *Univ of Mich Regents v Titan Ins Co*, 487 Mich 289, 314-317; ___ NW2d ___ (2010) (HATHAWAY, J., *concurring*). The reasons given in Justice KELLY's dissent in *Preserve the Dunes*, and the further reasons given in this opinion, make clear that *Preserve the Dunes* must be overruled and the law must be returned to how it was applied before *Preserve the Dunes* was incorrectly decided.

[10] We also asked the parties to brief whether an easement could grant Merit riparian rights on land the state of Michigan owned. Under *Thompson v Enz*, 379 Mich 667; 154 NW2d 473 (1967), and its progeny, including *Little v Kin*, 249 Mich App 502; 644

10

One of the issues in *Nestlé* was whether the plaintiffs had standing to appear in court to protect property from being affected by the defendant's pumping of groundwater that it intended to bottle and sell. At the time, a majority of this Court held that the plaintiffs only had standing with respect to property that they owned or used, no more. *Nestlé*, 479 Mich at 285. The majority relied on the theory of standing adopted in *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001). *Nestlé*, 479 Mich at 294-295. But this Court has recently explained that statutes granting standing should be applied as written, thus overruling the standing doctrine adopted in *Lee* and followed in *Nestlé*. *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 371 & n 18; ___ NW2d ___ (2010) (*LSEA*). Accordingly, MEPA, which specifies that "*any person* may maintain an action . . . against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction," should be applied as it is written. MCL 324.1701(1) (emphasis added).

We therefore need not address the standing issue from *Nestlé*. Plaintiffs in this case have interests that differ from the citizenry at large.[11] *LSEA*, 487 Mich at 359. And, even if they did not, it is clear that under MEPA "any person" has standing to maintain an action protecting Michigan's natural resources; indeed, the Attorney General admitted at

NW2d 375 (2002), riparian rights may be conveyed to a nonriparian landowner by easement under certain circumstances. However, even assuming arguendo that the proposed easement in this case is valid, we conclude that the proposed use is unreasonable. Thus, it is unnecessary to consider this issue further.

[11] Plaintiffs use or own property along waterways that would be affected under Merit's proposed discharge plan.

oral argument that that was the state's position as well. Because plaintiffs most certainly qualify under the statute's designation of "any person," plaintiffs would have standing regardless of this Court's decision in *Nestlé*.

## C. REASONABLENESS OF THE PROPOSED KOLKE CREEK DISCHARGE

Nonetheless, this Court's decision to overrule *Nestlé* in *LSEA* did not affect the reasonable-use balancing test. In its *Nestlé* opinion, this Court explicitly declined to "pass on the merits" of, among other things, the "reasonable use balancing test" that had been applied by the Court of Appeals.[12] Thus, this Court has not passed judgment on the merits of that test.

The parties have agreed that the reasonableness of the water's use is the determining factor in deciding water-use cases,[13] and they have also all noted that the facts in this case are distinguishable from those in *Nestlé*. In *Nestlé*, the diverted water was potable water being pumped out of the ground, packaged, and sold in many locations in and out of Michigan. In the instant case, contaminated water is being pumped from the ground in one watershed, treated and stripped of hydrocarbons but not fully decontaminated, and then pumped as surface water into a separate, previously uncontaminated watershed.

---

[12] *Nestlé*, 479 Mich at 289 n 12, 291.

[13] While the parties agree that the reasonableness of the water's use is the determining factor in deciding water-use cases, they do not agree on using the "reasonable use balancing test" from *Nestlé*. We do not pass judgment on that test in this case because, under any test and by any standard, the discharge plan at issue is manifestly unreasonable.

Plaintiffs focus much of their attention on the seminal Michigan water-law case of *Dumont v Kellogg*, 29 Mich 420 (1874), and its progeny[14] for the proposition that water cannot be diverted for an unreasonable use that would damage a riparian owner's use of the waterway. While it is true that Michigan courts have held that water should generally not be diverted from a watershed, we find that argument unpersuasive here. We distinguish *Dumont* and its progeny on the facts of this case.

Plaintiffs are seeking to protect the AuSable River watershed. Water is not being diverted from the AuSable River watershed in this case. The water that is being diverted is coming from the Manistee River watershed, and the reasonableness of merely diverting water out of the Manistee River watershed is not at issue. Thus, the cases that plaintiffs cite are not helpful on these facts.

It is clear from this Court's water-law precedent cited in both sides' briefs that an unreasonable use of water has never been deemed an allowable use and is not now an allowable use.[15] Defendants have presented no authority for the proposition that the diversion of contaminated water from one source to an uncontaminated watershed should

---

[14] *Hall v City of Ionia*, 38 Mich 493 (1878); *Kennedy v Niles Water Supply Co*, 173 Mich 474; 139 NW 241 (1913); *Hoover v Crane*, 362 Mich 36; 106 NW2d 563 (1960).

[15] The cases cited include *Dumont*; *Hall*; *Schenk v City of Ann Arbor*, 196 Mich 75; 163 NW 109 (1917); *Kennedy*; and *Hoover*.

be considered reasonable. It would be incongruous to hold that it is reasonable to decontaminate water by contaminating different water.[16]

Furthermore, it would be unconscionable and destructive for this Court to determine that it is reasonable to spread dangerous contamination throughout Michigan as we have described. The necessarily resulting harm would be spread not only to immediate downstream users but, in the end, to anyone in Michigan who relies, directly or indirectly, on our state's water remaining clean.

Accordingly, we affirm the lower courts' rulings preventing Merit's proposed discharge from the CPF into Kolke Creek.[17]

## IV. CONCLUSION

We hold that Merit's discharge plan is not an allowable use of water because it is manifestly unreasonable. We hold that the DEQ can be sustained as a defendant in a MEPA action for its permitting decisions. We uphold the lower courts' determination that the proposed discharge plan is unreasonable, and we remand the case for

---

[16] We do not hold that diverting water from one watershed to another is ipso facto unreasonable. Our concern today is with the discharge of contaminated water into an uncontaminated watershed.

[17] In reaching this decision, it is important to note that we focus our ruling on the reasonableness of using Kolke Creek as a discharge point for contaminated water removed from a separate watershed. We are not basing this decision on Merit's status as a riparian or groundwater user. We are not basing this decision on Merit's status as an off-tract or on-tract water user. And we are not basing this decision on the fact that Merit is seeking to divert water out of the Manistee River watershed.

reinstatement of the trial court's decision holding the DEQ accountable for violating MEPA.

Affirmed in part, reversed in part, and remanded.

Alton Thomas Davis
Diane M. Hathaway

STATE OF MICHIGAN

SUPREME COURT

ANGLERS OF THE AuSABLE, INC.,
MAYER FAMILY INVESTMENTS, LLC,
and NANCY A. FORCIER TRUST,

        Plaintiffs-Appellants,

v                                    Nos. 138863 to 138866

DEPARTMENT OF ENVIRONMENTAL
QUALITY, DIRECTOR OF THE
DEPARTMENT OF ENVIRONMENTAL
QUALITY, and MERIT ENERGY
COMPANY,

        Defendants-Appellees.

_____

KELLY, C.J. (*concurring*).

I concur in parts I, II, III(A), III(B), and IV of the lead opinion. I concur in the result only with respect to part III(C) of the lead opinion. I write separately to articulate my preferred approach to stare decisis.

Even when a decision is wrongly decided, we must apply the doctrine of stare decisis when deciding whether to overrule it. Our analysis should always begin with a presumption that upholding precedent is the preferred course of action.[1] That presumption should prevail unless effectively rebutted by the conclusion that a

---

[1] *Petersen v Magna Corp*, 484 Mich 300, 317; 773 NW2d 564 (2009) (opinion by KELLY, C.J.).

1

compelling justification exists to overturn it.[2]  By contrast, when analyzing precedent that itself represents a departure from established caselaw, we should apply a decreased presumption in favor of upholding precedent.[3]

In determining whether a compelling justification exists to overturn precedent, the Court may consider numerous evaluative criteria, none of which, standing alone, is dispositive.  These criteria include, but are not limited to, whether (1) the precedent has proved to be intolerable because it defies practical workability, (2) reliance on the precedent is such that overruling it would cause a special hardship and inequity, (3) related principles of law have so far developed since the precedent was pronounced that no more than a remnant of it has survived, (4) facts and circumstances have so changed, or have come to be seen so differently, that the precedent no longer has significant application or justification, (5) other jurisdictions have decided similar issues in a different manner, (6) upholding the precedent is likely to result in serious detriment prejudicial to public interests, and (7) the prior decision was an abrupt and largely unexplained departure from then-existing precedent.[4]

Not all of these factors will be applicable in a given case.  Nor is there a magic number of factors that must favor overruling a case in order to establish the requisite

---

[2] *Id.*

[3] *Univ of Mich Regents v Titan Ins Co*, 487 Mich 289, 303; ___ NW2d ___ (2010), citing *Adarand Constructors, Inc v Peña*, 515 US 200, 233-234; 115 S Ct 2097; 132 L Ed 2d 158 (1995).

[4] *Petersen*, 484 Mich at 320.

compelling justification. Rather, the conclusion about overturning the precedent should be reached on a case-by-case basis.

I believe that *Preserve the Dunes, Inc v Dep't of Environmental Quality*[5] was wrongly decided with respect to whether the Department of Environmental Quality (DEQ) may be liable for an alleged violation of the Michigan environmental protection act (MEPA) by issuing a permit.[6] However, this fact alone does not constitute the requisite compelling justification to overrule the decision. Instead, we must examine additional factors.

First, I consider whether *Preserve the Dunes* has proved intolerable because it defies practical workability. I believe that it does. The *Preserve the Dunes* majority held that the DEQ's issuance of a permit is "unrelated to" alleged environmental harm and thus insulated from scrutiny under MEPA.[7] This conclusion was directly contrary to a simple reading of MEPA. MCL 324.1701(1) provides, in pertinent part:

> *any person* may maintain an action in the circuit court . . . where the alleged violation occurred or is *likely* to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources . . . from pollution, impairment, or destruction. [Emphasis added.]

---

[5] *Preserve the Dunes, Inc v Dep't of Environmental Quality*, 471 Mich 508; 684 NW2d 847 (2004).

[6] MCL 324.1701 *et seq*.

[7] *Preserve the Dunes*, 471 Mich at 511.

3

Under the act, a plaintiff makes a prima facie case by showing "that the conduct of the defendant . . . is likely to . . . destroy . . . natural resources or the public trust in these resources."[8]

The *Preserve the Dunes* majority's conclusion that eligibility for a permit is unrelated to whether the conduct permitted will harm the environment is untenable. Issuance of a permit to an ineligible party to engage in an activity that will harm the environment will certainly allow "conduct . . . likely to pollute, impair, or destroy . . . natural resources or the public trust in these resources" under MCL 324.1703(1). Indeed, before *Preserve the Dunes*, this Court observed that a violation of a permitting procedure can support a prima facie claim under MEPA.[9] Thus, by gutting the environmental protections afforded to Michigan citizens by MEPA, *Preserve the Dunes* mocked our Legislature's intent to prevent environmental harm. Accordingly, *Preserve the Dunes* was inherently unworkable under the statutory provisions provided by the Legislature.

Second, I consider whether reliance interests weigh in favor of overruling *Preserve the Dunes*. I conclude that they do. *Preserve the Dunes* is of relatively recent vintage, having been decided a mere six years ago. Hence, any reliance on its holding has been of limited duration. Moreover, *Preserve the Dunes* represented a sea change in

---

[8] MCL 324.1703(1).

[9] A "plaintiff's prima facie case is 'not restricted to actual environmental degradation but also encompasses probable damage to the environment as well.'" *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16, 25; 576 NW2d 641 (1998), quoting *Ray v Mason Co Drain Comm'r*, 393 Mich 294, 309; 224 NW2d 883 (1975).

one area of the law and toppled settled interpretations of MEPA that had existed for nearly 30 years.[10]  In doing so, *Preserve the Dunes* disrupted the reliance interests of Michigan citizens who relied on MEPA's provisions to bring suit for alleged environmental pollution, impairment, or destruction.

I recognize that there exists a competing reliance interest in the continuing validity of *Preserve the Dunes*: that of the DEQ in defending its permitting decisions.  Yet *Preserve the Dunes*' annihilation of the crux of a MEPA complainant's claim—the desire to quell environmental degradation—effectively removed altogether the ability to challenge permitting decisions as allowed by MEPA.  I conclude that, while the DEQ's reliance on this interpretation is understandable, it is not sufficient to preclude overruling *Preserve the Dunes* given the extent of prejudice to those availing themselves of MEPA's straightforward language.

Third, I consider whether related principles of law have developed since *Preserve the Dunes* was decided.  This factor is inapplicable to my stare decisis analysis in this case, as no intervening change in the law further supports or undermines the continuing legitimacy of *Preserve the Dunes*.

Fourth, I examine whether facts and circumstances have so changed, or have come to be seen so differently, that *Preserve the Dunes* has been robbed of significant justification.  Like the previous factor, I discern no factual or circumstantial changes that

---

[10] See, e.g., *Eyde v Michigan*, 393 Mich 453, 454; 225 NW2d 1 (1975); *Ray*, 393 Mich at 304-305; *West Mich Environmental Action Council v Natural Resources Comm*, 405 Mich 741, 751; 275 NW2d 538 (1979); *Nemeth*, 457 Mich 16.

counsel for or against overruling *Preserve the Dunes*. Therefore, this factor is also inapplicable to my analysis.

Fifth, I consider whether other jurisdictions have decided similar issues in a different manner. This factor is likewise inapplicable to my stare decisis analysis. MEPA is unique to our state. Although other states' environmental legislation may share the fundamental underpinnings of MEPA, judicial interpretations thereof have evolved independently of those of other states with similar environmental schemes. Thus, other jurisdictions' interpretations of similar statutes are unhelpful to our analysis in this case.

Sixth, I examine whether upholding *Preserve the Dunes* is likely to result in serious detriment prejudicial to public interests. This factor weighs heavily in favor of overruling *Preserve the Dunes*. In one swoop of a pen, the *Preserve the Dunes* majority obliterated environmental protection statutes enacted by the Legislature. As persuasively noted by Justice DAVIS, MEPA was enacted in response to our state's constitutional commitment to the conservation and development of the natural resources. Our constitution provides:

> The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. *The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction.*[11]

Furthermore, as we stated in *Ray*:

---

[11] Const 1963, art 4, § 52 (emphasis added).

6

Michigan's EPA was the first legislation of its kind and has attracted worldwide attention. The act also has served as a model for other states in formulating environmental legislation. The enactment of the EPA signals a dramatic change from the practice where the important task of environmental law enforcement was left to administrative agencies without the opportunity for participation by individuals or groups of citizens. Not every public agency proved to be diligent and dedicated defenders of the environment. The EPA has provided a sizable share of the initiative for environmental law enforcement for that segment of society most directly affected—the public.

\* \* \*

But the EPA does more than give standing to the public and grant equitable powers to the circuit courts, it also imposes a duty on individuals and organizations both in the public and private sectors to prevent or minimize degradation of the environment which is caused or is likely to be caused by their activities.[12]

Thus, whereas MEPA represents the culmination of the Legislature's deliberative process, *Preserve the Dunes* undermined the Legislature's decision to allow challenges to both real and potential harms to the environment. The impact of *Preserve the Dunes* was undoubtedly felt not only by the environment, but by the public. The citizens of Michigan were stripped of their ability to enforce environmental protection mechanisms granted by the Legislature.

Finally, I consider whether *Preserve the Dunes* represented an abrupt and largely unexplained departure from precedent. I conclude that this factor also weighs heavily in favor of overruling *Preserve the Dunes*. As previously noted, *Preserve the Dunes*

---

[12] *Ray*, 393 Mich at 304-306.

implicitly overruled numerous previous decisions of this Court interpreting MEPA.[13] Those decisions stood as principled interpretations of MEPA until *Preserve the Dunes* unexpectedly swept them aside decades later. Therefore, *Preserve the Dunes* represented an abrupt and unexplained departure from precedent.

In summary, *Preserve the Dunes* (1) is unworkable because it usurped the Legislature's grant of a cause of action regarding environmental harm, (2) caused serious detriment prejudicial to public interests, and (3) represented an abrupt and largely unexplained departure from precedent. Accordingly, I conclude that a compelling justification exists for overruling it.

Marilyn Kelly
Michael F. Cavanagh

---

[13] See n 10 of this opinion.

S T A T E   O F   M I C H I G A N

SUPREME COURT

ANGLERS OF THE AUSABLE, INC;
MAYER FAMILY INVESTMENTS, LLC;
and NANCY A. FORCIER TRUST,

        Plaintiffs-Appellants,

v                                     No. 138863 to 138866

DEPARTMENT OF ENVIRONMENTAL
QUALITY, DIRECTOR OF THE
DEPARTMENT OF ENVIRONMENTAL
QUALITY, and MERIT ENERGY
COMPANY,

        Defendants-Appellees.

_____

YOUNG, J. (*dissenting*).

I respectfully, but vigorously, dissent from the extraordinarily lawless and profoundly dangerous lead opinion and from the results reached by a majority of this Court.

This case represents one of the most shocking examples of the assertion of power that is not grounded in the constitution or any statute. This case is simply an empty vehicle to reach desired policy results.[1] This is so because this case was moot in June 2010 when the majority inexplicably denied defendants' meritorious motion to dismiss

_____

[1] The shocking paucity of legal authority relied on by the lead opinion is a prime indicator that no more than naked judicial policymaking is afoot.

for mootness;[2] this case was moot in November 2010 when this Court heard oral arguments on the case, despite its obvious mootness; and this case remains moot today, despite the majority's raw exercise of power in deciding a nonjusticiable case. The lead opinion does not even attempt to respond to this dissent because there *are* no satisfactory responses. Because I continue to believe that this Court should not decide moot cases, I would dismiss this appeal.

Unwilling to forgo the opportunity to resolve a nonexistent conflict to attack precedent with which they disagree, the lead and concurring opinions overturn this Court's decision in *Preserve the Dunes v Dep't of Environmental Quality*[3] that the Department of Environmental Quality (DEQ)[4] may not be sued under the Michigan environmental protection act (MEPA)[5] for issuing a permit. Indeed, the lead and concurring opinions now conclude that the DEQ may be sued even if the permit it issued was already successfully challenged under the appropriate administrative procedures. Furthermore, the lead opinion fashions a new common law rule governing water rights *out of whole cloth and without citing __any__ authority for its new categorical rule.* Instead, the lead opinion's categorical rule usurps the ability of the DEQ's environmental experts to determine what action appropriately protects the natural resources held in public trust,

---

[2] *Anglers of the AuSable, Inc v Dep't of Environmental Quality*, 486 Mich 982 (2010).

[3] *Preserve the Dunes v Dep't of Environmental Quality*, 471 Mich 508; 684 NW2d 847 (2004).

[4] The DEQ is now part of the Michigan Department of Natural Resources and Environment (DNRE).

[5] MCL 324.1701 *et seq.*

2

and it usurps the ability of lower courts to judge the validity of those expert analyses by interposing a categorical rule prohibiting "contamination," regardless of actual harm to the relevant watercourse. Because Michigan law has not heretofore provided for such a categorical rule, I must vigorously dissent from this palpably erroneous decision. Again, the lead opinion reaches its decision on the substantive merits of this case without responding to *any* of the critiques I make of its argument.

## I. FACTS AND PROCEDURAL HISTORY

Defendant Merit Energy Company owns land in the Manistee River watershed that contains a plume of contaminated groundwater. When Merit purchased the land, the contaminated plume already existed and threatened private wells for drinking water. Merit's purchase of the land was contingent on an agreement with the DEQ requiring Merit to remediate the plume. Accordingly, Merit devised a corrective action plan to treat the contaminated water and to discharge the treated water into Kolke Creek, part of the AuSable River watershed. To effect this plan, Merit obtained an easement from the Michigan Department of Natural Resources (DNR)[6] to "place, construct, operate, repair and maintain [a] Pipeline" beginning on Merit's property and ending at Kolke Creek. Merit also sought DEQ approval of its plan. The DEQ issued a certificate of coverage (COC), which affirmed that the proposed discharge was consistent with a general permit that allowed "discharges of wastewater contaminated by gasoline and/or related

---

[6] The DNR is now part of the DNRE. However, at the time the DNR granted Merit an easement, it was a separate executive agency.

petroleum products . . . ."  Therefore, Merit received the requisite certification that it could discharge under "a valid national or state permit . . . ."[7]

Plaintiffs include riparian owners along Kolke Creek.  They challenged the COC in a contested case hearing pursuant to the Administrative Procedures Act.[8]  After the administrative referee affirmed the DEQ's decision, plaintiffs appealed by right to the Otsego Circuit Court.  In addition to appealing the contested case decision, plaintiffs brought original claims against defendants for alleged MEPA violations and alleged violations of plaintiffs' common law riparian rights.  The circuit court separated plaintiffs' appeal of the contested case decision from their original claims and remanded the contested case decision for review by the director of the DEQ.  The director affirmed the administrative decision to issue Merit a COC.  On appeal, the circuit court vacated the COC because the discharge allowed under the COC contained contaminants beyond those allowed under the general permit the COC purported to enforce.  The circuit court's decision invalidating the COC remains in force.[9]

The circuit court conducted a 13-day bench trial to consider plaintiffs' common law and MEPA claims.  The court held that the DNR's proposed easement did not

---

[7] Mich Admin Code, R 323.2106(1).

[8] MCL 24.201 *et seq*.

[9] The Court of Appeals denied defendants' delayed application for leave to appeal.  This Court initially remanded the appeal to the Court of Appeals for consideration as on leave granted, 482 Mich 1078 (2008), but subsequently granted reconsideration and denied the application, 483 Mich 887 (2009).  Accordingly, the circuit court's vacation of the COC remains intact.

4

provide Merit with the necessary riparian rights to discharge *anything* into Kolke Creek.[10] The circuit court also concluded that the proposed discharge would violate plaintiffs' riparian rights. In reaching this decision, the court applied the "reasonable use balancing test" that the Court of Appeals articulated in *Mich Citizens for Water Conservation v Nestlé Waters North America Inc.*[11] Because "[t]he proposed use is for the benefit of distant non-riparian parcels at the expense of local riparian rights" and because "[t]he delicate ecosystem of Kolke Creek is not a suitable location for the discharge of treated water in the quantities proposed," the court concluded that the proposed discharge would constitute an unreasonable use of Kolke Creek. Accordingly, it enjoined defendants from discharging the treated water into Kolke Creek in the volume proposed, 1.15 million gallons a day. The court also determined that plaintiffs had presented a prima facie MEPA violation with respect to both Merit and the DEQ.

Defendants appealed in the Court of Appeals, and plaintiffs filed a cross-appeal in that court. The DEQ challenged the circuit court's ruling that it could be sued on the theory that its COC violated MEPA. Merit challenged the circuit court's conclusions regarding the scope of the DNR's easement, the application of the "reasonable use balancing test" in determining that the proposed discharge was unreasonable, and the

---

[10] The circuit court subsequently clarified its order to indicate that the DNR *could* assign its riparian rights to Merit, but that it had not done so in the easement before the court.

[11] *Mich Citizens for Water Conservation v Nestlé Waters North America Inc*, 269 Mich App 25; 709 NW2d 174 (2005), aff'd in part, rev'd in part, and remanded on other grounds 479 Mich 280 (2007).

application of MEPA and the common law to the proposed discharge.[12] On cross-appeal, plaintiffs argued that the circuit court should not have applied the *Nestlé* "reasonable use balancing test" because, as part of the common law pertaining to groundwater, it was inapplicable to their surface water riparian rights.

A unanimous Court of Appeals panel reversed in part the circuit court's ruling.[13] Citing this Court's opinion in *Preserve the Dunes*,[14] the Court of Appeals concluded that the DEQ's administrative decision to issue permits to Merit did not violate MEPA. The Court of Appeals also reversed the circuit court's ruling on the scope of the DNR's easement to Merit and concluded that the DNR conveyed the right to discharge water, which the panel characterized as "inherently riparian and therefore connected to, rather than apart from, the land."[15] However, the Court of Appeals affirmed the circuit court's application of the "reasonable use balancing test,"[16] thereby leaving in place the injunction against Merit's proposed discharge.

Plaintiffs sought leave to appeal in this Court, claiming that this Court should, among other requested relief, overturn the "reasonable use balancing test" and this Court's decisions in *Preserve the Dunes* and *Mich Citizens for Water Conservation v*

---

[12] Defendants also raised several evidentiary errors, none of which are at issue in the instant appeal.

[13] *Anglers of the AuSable, Inc v Dep't of Environmental Quality*, 283 Mich App 115; 770 NW2d 359 (2009).

[14] *Preserve the Dunes*, 471 Mich at 512.

[15] *Anglers*, 283 Mich App at 131-132.

[16] *Id*. at 136.

*Nestlé Waters North America Inc.*[17]  Defendant Merit did not cross-appeal.  This Court granted plaintiffs' application for leave to appeal on January 29, 2010, and specifically asked the parties to brief, among other issues, "whether *Michigan Citizens v Nestlé Waters . . .* and *Preserve the Dunes v DEQ . . .* were correctly decided."[18]

In the intervening period, however, Merit quitclaimed its interest in the easement back to the newly combined Department of Natural Resources and Environment and provided thorough documentation to this Court to prove that it had done so.  Accordingly, Merit moved to dismiss, claiming that plaintiffs' appeal was moot because Merit had abandoned its plan to discharge water into Kolke Creek, as evidenced by its relinquishment of the DNR easement.  Because Merit no longer had physical access to Kolke Creek, it argued that it could not violate MEPA or plaintiffs' common law riparian rights in the way plaintiffs alleged.  Further, Merit offered proof that it had filed for a new groundwater discharge permit to achieve its treatment goals by an alternative plan that would avoid discharging treated water into Kolke Creek.  Nevertheless, a majority of this Court denied Merit's motion to dismiss for mootness on June 18, 2010.[19]

---

[17] *Mich Citizens for Water Conservation v Nestlé Waters North America Inc*, 479 Mich 280; 737 NW2d 447 (2007).

[18] *Anglers of the AuSable, Inc v Dep't of Environmental Quality*, 485 Mich 1067 (2010) (citations omitted).

[19] *Anglers*, 486 Mich 982.

## II.  STANDARD OF REVIEW

This case implicates issues of constitutional law, statutory interpretation, and the common law.  Each of these issues is a question of law, which this Court reviews de novo.[20]

## III.  JUSTICIABILITY

## A.  BACKGROUND

This Court has the constitutional authority to exercise only the judicial power, not "powers properly belonging to another branch . . . ."[21]  The people of Michigan have ratified this "cardinal principle"[22] of republican government into each of their successive constitutions since the first, the Michigan Constitution of 1835.[23]  Moreover, this principle is "'in harmony with American political theory . . . .'"[24]  Indeed, the drafters of the United States Constitution made it clear that each branch of government could not

---

[20] *Little v Hirschman*, 469 Mich 553, 557; 677 NW2d 319 (2004).

[21] Const 1963, art 3, § 2.

[22] *Civil Serv Comm v Auditor General*, 302 Mich 673, 683; 5 NW2d 536 (1942).

[23] Const 1908, art 4, § 2 ("No person belonging to one department shall exercise the powers properly belonging to another, except in the cases expressly provided in this constitution."); Const 1850, art 3, § 2 ("No person belonging to one department shall exercise the powers properly belonging to another, except in the cases expressly provided in this constitution."); Const 1835, art 3, § 1 ("The powers of the government shall be divided into three distinct departments; the Legislative, the Executive and the Judicial; and one department shall never exercise the powers of another, except in such cases as are expressly provided for in this constitution.").

[24] *Civil Serv Comm*, 302 Mich at 683, quoting *Wood v State Admin Bd*, 255 Mich 220, 224; 238 NW 16 (1931).

exercise the powers of the other two branches.[25] James Madison considered the principle of separation of powers essential to the operation of the federal government:

> The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny. Were the federal Constitution, therefore, really chargeable with the accumulation of power, or with a mixture of powers, having a dangerous tendency to such an accumulation, no further arguments would be necessary to inspire a universal reprobation of the system.[26]

Madison went on to explain that, despite the strong disagreements between federalists and antifederalists over the proper scope of the federal government, all agreed that the tripartite form of government was sacrosanct:

> It is agreed on all sides, that the powers properly belonging to one of the departments ought not to be directly and completely administered by either of the other departments. It is equally evident, that none of them ought to possess, directly or indirectly, an overruling influence over the others, in the administration of their respective powers.[27]

---

[25] See US Const, art I, § 1 ("*All* legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.") (emphasis added); US Const, art II, § 1 ("*The* executive Power shall be vested in a President of the United States of America.") (emphasis added); US Const, art III, § 1 ("*The* judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.") (emphasis added).

[26] Madison, The Federalist No. 47.

[27] Madison, The Federalist No. 48.

In the nearly two and a quarter centuries since the United States Constitution's ratification, the separation of powers doctrine has become "[p]erhaps the most fundamental doctrine in American political and constitutional thought . . . ."[28]

Although the Michigan Constitution does not expressly define "the judicial power," as early as 1859, this Court limited the judicial power to "the power to hear and determine controversies between adverse parties, and questions in litigation."[29] Justice THOMAS COOLEY wrote:

> [A] marked difference exists between the employment of judicial and legislative tribunals. The former decide upon the legality of claims and conduct, and the latter make rules upon which, in connection with the constitution, those decisions should be founded. It is the province of judges to determine what is the law *upon existing cases.*[30]

Justice CHAMPLIN applied this principle in *Risser v Hoyt*, explaining:

> [T]he exercise of judicial power in its strict legal sense can be conferred only upon courts named in the Constitution. The judicial power referred to is the authority to hear and decide controversies, and to make binding orders and judgments respecting them.[31]

Thus, there is more than a century and a half of authority from this Court that limits the constitutional power of the judiciary to deciding live cases and controversies

---

[28] *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 418; ___ NW2d ___ (2010) (CORRIGAN, J., dissenting).

[29] *Daniels v People*, 6 Mich 381, 388 (1859).

[30] Cooley, Constitutional Limitations (1st ed), p 92 (emphasis added).

[31] *Risser v Hoyt*, 53 Mich 185, 193; 18 NW 611 (1884).

10

between interested parties. Moreover, the current constitutionally defined exceptions to this rule[32] help to prove the rule itself:

> In considering whether the Court should have the power to issue advisory opinions in nonadversarial proceedings at the request of other branches of government, the delegates' entire discussion was clearly premised on the *unquestioned assumption* that the judicial power, generally, was rooted in a case or controversy requirement. At the outset, Delegate Harold Norris explicitly asked with regard to the proposed section: "Does that mean that as far as this committee is concerned, they do not wish to preserve *the traditional notion that there must be a case or controversy presented before the court may exercise its judicial power*?" 1 Official Record, Constitutional Convention 1961, p 1544 (emphasis added). When the question was raised whether the power to issue an advisory opinion would be equivalent to the courts' preexisting power to issue declaratory judgments, Delegate Eugene Wanger similarly specified that the courts' preexisting power, even in the arena of declaratory judgments, distinctly required "an actual controversy between individuals . . . ." *Id.* at 1545. Delegate Raymond King may have expressed the understanding most clearly when he remarked:
>
> > "*We are indeed contemplating a very serious change in what I think to be the history and the tradition of justice in this country.* Mr. Wanger has pointed out the troubles that the Massachusetts supreme court got into when they allowed themselves *to leave the theory of case and controversy.*" [*Id.* at 1546 (emphasis added).]
>
> Indeed, even with regard to the limited expansion of judicial power represented by the proposed advisory opinion provision, delegates were expressly concerned that it would "adversely affect[] the separation of powers doctrine . . . ." *Id.* at 1545 (Delegate Wanger); see also *id.* at 1546 (Delegate Jack Faxon indicating that the convention "should be wary of any violation of the separation of powers"); *id.* at 1547 (Delegate King stating: "I think we have established through the English common law and our

---

[32] See Const 1963, art 9, § 32 (conferring standing upon "[a]ny taxpayer of the state" to bring suit to enforce the provisions of the Headlee Amendment); Const 1963, art 11, § 5 (empowering "any citizen of the state" to bring injunctive or mandamus proceedings to enforce the civil service laws of the state); Const 1963, art 3, § 8 (allowing either house of the Legislature or the Governor to request that this Court issue an advisory opinion on the "constitutionality of legislation").

adherence thereto a system of justice, a system of separation of powers which has proven itself, and I think we ought to be very reluctant at this time to try something new.").[33]

More recently, this Court has articulated the following core definition of the judicial power:

> The "judicial power" has traditionally been defined by a combination of considerations: the existence of a real dispute or case or controversy; the avoidance of deciding hypothetical questions; the plaintiff who has suffered real harm; the existence of genuinely adverse parties; the sufficient ripeness or maturity of a case; the eschewing of cases that are moot at any stage of their litigation; the ability to issue proper forms of effective relief to a party; the avoidance of political questions or other non-justiciable controversies; the avoidance of unnecessary constitutional issues; and the emphasis upon proscriptive as opposed to prescriptive decision making.

> Perhaps the most critical element of the "judicial power" has been its requirement of a genuine case or controversy between the parties, one in which there is a real, not a hypothetical, dispute, *Muskrat v United States*, 219 US 346; 31 S Ct 250; 55 L Ed 246 (1911), and one in which the plaintiff has suffered a "particularized" or personal injury. *Massachusetts v Mellon*, 262 US 447, 488; 43 S Ct 597; 67 L Ed 2d 1078 (1923). Such a "particularized" injury has generally required that a plaintiff must have suffered an injury distinct from that of the public generally. *Id.*[34]

This case involves an issue central to this Court's constitutional exercise of the judicial power: mootness.[35]

---

[33] *Lansing Sch Ed Ass'n*, 487 Mich at 423-425 (CORRIGAN, J., dissenting).

[34] *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 615; 684 NW2d 800 (2004). *Nat'l Wildlife* was overruled by *Lansing Sch Ed Ass'n*, 487 Mich 349.

[35] This Court also asked the parties to brief whether *Nestlé* was correctly decided. *Nestlé* involved an aspect of this Court's standing doctrine: the injury-in-fact requirement. In that case, this Court held that "[w]here the plaintiff claims an injury related to the environment, this Court lacks the 'judicial power' to hear the claim if the plaintiff cannot aver facts that he has suffered or will imminently suffer a concrete and particularized

12

## B. ANALYSIS

The long-established mootness doctrine prevents courts from hearing abstract questions of law in cases that no longer contain live controversies. This Court has recently reaffirmed that moot questions generally cannot be adjudicated.[36] *People v Richmond* is merely the most recent affirmation of this well-established principle and is entirely consistent with over a century of precedent of this Court.

*Street R Co of East Saginaw v Wildman*, an 1885 case of this Court, is an especially apt application of the mootness doctrine.[37] In *Street R Co*, the plaintiff railroad sought to enjoin the defendant from moving a building along its railroad tracks "to the great interruption of its business and profits, the serious inconvenience of the public, and the hindrance and delay of the United States mails which it carried . . . ."[38] Shortly after the trial court dismissed the plaintiff's claim, but before the plaintiff appealed in this Court, the defendant moved the building, thereby negating any ability for a court to prevent the claimed harm through the injunctive relief sought. On appeal, this Court determined that "[i]f the complainant was ever entitled to the [equitable] relief prayed for,

---

injury in fact." *Nestlé*, 479 Mich at 295. It is improvident for this Court to consider the broader question that *Nestlé* presented because there is no serious doubt that plaintiffs have standing under *Nestlé*.

[36] *People v Richmond*, 486 Mich 29, 35-41; 782 NW2d 187 (2010).

[37] *Street R Co of East Saginaw v Wildman*, 58 Mich 286; 25 NW 193 (1885).

[38] *Id*.

we cannot now make any decree to aid it" because "[w]e can hardly prevent [the defendant] from doing what has already been done."[39]

In a subsequent case, *Anway v Grand Rapids R Co*, this Court further articulated the scope of the judicial power as it related to moot questions:

> "Courts of judicature are organized only to decide real controversies between actual litigants. When, therefore, it appears, no matter how nor at what stage, that a pretended action is not a genuine litigation over a contested right between opposing parties, but is merely the proffer of a simulated issue by a person dominating both sides of the record, the court, from a sense of its own dignity, as well as from regard to the public interests, will decline a determination of the fabricated case so fraudulently imposed upon it."[40]

The Court concluded with a nonexhaustive list of cases in which the Michigan Supreme Court had previously "declined to consider abstract questions of law and which [it] declined to decide where our conclusions could not be made effective by final judgment, decree, and process . . . ."[41]

---

[39] *Id.* at 287.

[40] *Anway v Grand Rapids R Co*, 211 Mich 592, 612-613; 179 NW 350 (1920), quoting *Judson v Flushing Jockey Club*, 14 Misc 350; 36 NYS 126, 127 (NY Common Pleas, 1895).

[41] *Anway*, 211 Mich at 622, citing *Schouwink v Ferguson*, 191 Mich 284; 157 NW 726 (1916) (involving mandamus against a municipality to issue a license to operate a motorbus business that, by its own terms, would have expired before the writ of mandamus could have entered); *Carlson v Wyman*, 189 Mich 402; 155 NW 418 (1915) (involving mandamus against a municipality to issue a liquor license that, by its own terms, would have expired before the writ of mandamus could have entered); *Howe v Doyle*, 187 Mich 655; 154 NW 62 (1915) (involving an appeal of an injunction prohibiting the Michigan Securities Commission from enforcing a blue sky law that the Legislature had since repealed); *Street R Co*, 58 Mich 286; *Hicks v J B Pearce Co*, 158 Mich 502; 122 NW 1087 (1909) (involving an injunction prohibiting the sale of chattels that had already been sold); *Brown, ex rel Van Buren v Lawrence*, 197 Mich 178; 163

The facts of this case make clear that *Merit no longer has the physical means of discharging treated water into Kolke Creek*, and the circuit court *vacated the certificate of coverage issued by the DEQ.* Thus, the very harms that plaintiffs sought to enjoin no longer exist. Merit has no legal means to injure plaintiffs.[42] The plain fact that the lead opinion ignores is that this Court simply cannot remedy harms that cannot now possibly occur.[43] Stunningly, all of this is a matter of indifference to those who subscribe to the lead opinion's result. Apparently, the conclusive facts of the case are of no moment or

---

NW 862 (1917) (involving a quo warranto proceeding questioning the legitimacy of a corporate officer's ouster after that officer had since been elected again to the corporate board); *Ideal Furnace Co v Int'l Molders' Union*, 204 Mich 311; 169 NW 946 (1918) (involving an appeal of a contempt citation that had since been discharged by payment of the disputed fine); *Blickle v Grand Rapids Bd of Ed*, 210 Mich 196; 177 NW 385 (1920) (involving mandamus against a school board to admit a student who had since become too old to attend the school); *Tierney v Union Sch Dist of Bay City*, 210 Mich 424; 177 NW 955 (1920) (involving an appeal seeking an injunction prohibiting a school board from expending monies to campaign for a ballot proposal after the election had already occurred).

[42] Further, *any* renewed plan to discharge water into Kolke Creek would require Merit to undertake anew not only the DEQ's permitting process, which plaintiffs may challenge through the appropriate administrative process, but also the negotiation of a new easement with a riparian landowner.

[43] The conclusion that the harm plaintiffs feared cannot possibly occur is further strengthened by evidence that Merit is heavily invested in an alternative plan for discharge. Merit's discharge permit and corrective action plan have been modified to allow its alternative plan. Merit is now discharging the water by alternative means, albeit with considerable costs to the company. Specifically, Merit relates that its current modified permit allows for a much lower discharge volume, which will extend the time required to clean up the plume that previously threatened the surrounding private drinking wells. Further, the new plan required Merit to clear-cut 40 acres of forest in order to construct infiltration basins.

hindrance when the goal is to use this case as a vehicle to reach policy objectives that the lead opinion wishes to address.

As established by *Street R Co* and subsequent caselaw regarding mootness, it obviously follows for all but a majority of this Court that, without the threatened construction and use of the pipeline and without *any* DEQ permit authorizing the discharge, there remains no threatened injury to plaintiffs' riparian rights, and certainly none that this Court can remedy. Similarly, there remains no threatened MEPA violation, either by Merit or by the DEQ.

In short, plaintiffs' common law riparian rights and their rights under MEPA are secure. *Indeed, plaintiffs do not now contend that they have an immediate injury at stake*; they nevertheless want this Court to rule on the substantive legal issues—for the benefit of *future* cases. This is the definition of mootness. Again, the *Street R Co* decision provides guidance:

> It was suggested on the hearing that we ought to settle the rights of the parties so that the principle established might be a guide in other cases likely to arise. But courts of equity will not lend their aid by injunction for the enforcement of a right or the prevention of a wrong in the abstract, not connected with any injury or damage to the person seeking relief, nor when such injury or damage can be fully and amply recovered in an action at law. Nor are courts of equity established to decide or declare abstract questions of right for the future guidance of suitors.[44]

---

[44] *Street R Co*, 58 Mich at 287.

16

In their brief opposing Merit's motion to dismiss, plaintiffs claimed that this case fits into an exception to the mootness doctrine, that "the issue is one of public significance that is likely to recur, yet evade judicial review."[45] Not so.

The issues presented here are *not* the sorts of issues whose transitory nature—often because the issues involved are time-sensitive—makes it likely that future litigation would "evade judicial review."[46] To the contrary, any riparian owner aggrieved by the actions or imminently threatened actions of another can seek injunctive or other relief.

The lead opinion claims that "the trial court has left open the door for Merit to discharge treated water into Kolke Creek at a lower than originally proposed rate."[47]

---

[45] *Federated Publications, Inc v City of Lansing*, 467 Mich 98, 112; 649 NW2d 383 (2002).

[46] *Socialist Workers Party v Secretary of State*, 412 Mich 571, 582 n 11; 317 NW2d 1 (1982). *Socialist Workers Party* cited several federal cases for the proposition that a court can consider a moot question that is capable of repetition, yet evading review, including *Storer v Brown*, 415 US 724; 94 S Ct 1274; 39 L Ed 2d 714 (1974) (allowing a constitutional challenge to a California requirement that a person may not run for election as an independent candidate within six months of having been a registered member of a political party after the plaintiff had met the independence requirement); *Dunn v Blumstein*, 405 US 330; 92 S Ct 995; 31 L Ed 2d 274 (1972) (allowing a constitutional challenge to a Tennessee voter eligibility requirement that a person be a resident of the state for one year after the plaintiff had met the residency requirement); *Moore v Ogilvie*, 394 US 814; 89 S Ct 1493; 23 L Ed 2d 1 (1969) (allowing a constitutional challenge to an Illinois requirement that independent candidates for presidential electors receive at least 200 signatures from each of at least 50 of the state's 102 counties); *Southern Pacific Terminal Co v Interstate Commerce Comm*, 219 US 498; 31 S Ct 279; 55 L Ed 310 (1911) (allowing a challenge to a temporary ICC cease and desist order after the order had already expired). See also *Roe v Wade*, 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973) (allowing a constitutional challenge to a Texas abortion law after the plaintiff had given birth).

[47] *Ante* at 4 n 4.

17

This claim appears plausible when looking solely at the circuit court's June 26, 2007, amended opinion. But that opinion was superseded by subsequent events. In particular, the circuit court's January 31, 2008, opinion ruled that the DEQ had erroneously issued a permit to Merit. Both the Court of Appeals and, eventually, this Court denied defendants' applications for leave to appeal, leaving intact the circuit court's opinion. Accordingly, even if the circuit court's June 26, 2007, decision "left open the door for Merit to discharge treated water into Kolke Creek," its January 31, 2008, decision closed that door, and this Court's denial of leave bolted the door shut. Further, without *either* physical access to Kolke Creek *or* a valid permit, Merit has no lawful authority to discharge *any* amount of *anything* into Kolke Creek.

In short, there is not a clearer instance of mootness than this case: the action originally challenged by plaintiffs can no longer be physically or legally accomplished by *any* of the defendants. Nevertheless, a majority of this Court has seen fit to decide the substantive issues of this case. The decision of four members of this Court to proceed on the substantive merits is profoundly flawed and inconsistent with longstanding principles of constitutional law. Worse still, the lead opinion is itself profoundly flawed and inconsistent with longstanding principles of the common law and of statutory interpretation. Therefore, I am compelled to respond seriatim to the lead opinion's substantive claims.

## IV. PLAINTIFFS' COMMON LAW RIPARIAN CLAIMS

I vigorously dissent from the lead opinion's creation of a new common law rule that certain discharges of contaminants are per se unreasonable infringements on riparian

18

owners' rights. Unfortunately, I fear that the haste to render a decision in this case before the end of calendar year 2010, while perhaps grounded in a good intention to protect this state's environmental resources, could result in great mischief to the law. Indeed, "[g]ood intentions, unsupported by well informed policy choices, often result in bad law."[48] In its haste to fashion its rule, the lead opinion elided several necessary inquiries.[49] More troubling, the lead opinion created out of whole cloth a palpably erroneous common law standard that is not grounded in this state's water law.

---

[48] Young, *A judicial traditionalist confronts the common law*, 8 Tex R L & Pol 299, 307 (2004).

[49] For a preliminary example, the lead opinion assumes, without deciding, that the DNR's easement allowed Merit to discharge treated water into Kolke Creek. The lead opinion acknowledges that this issue is properly before the Court, because "[t]he trial court . . . made findings as to whether Merit had properly obtained rights to discharge the treated water through the state-land easement." *Ante* at 4 n 3. Yet the lead opinion refuses to reach this issue because it "[did] not find those issues to be outcome-determinative . . . ." *Ante* at 4 n 3. The lead opinion puts the cart before the horse in making this determination without explanation, because this issue is a condition precedent to every subsequent one in this section. This is another indicator that the lead opinion is not interested in legal analysis but instead is driven to reach a particular result. Nevertheless, I agree with the Court of Appeals that, because the easement unambiguously allowed Merit to "operate" the pipeline, the easement purported to grant Merit the right to discharge treated water into Kolke Creek.

The lead opinion also refuses to decide whether the DNR *can* grant an easement for Merit's physical access to Kolke Creek, instead claiming that "it is unnecessary to consider this issue" because "even assuming arguendo that the proposed easement in this case is valid, . . . the proposed use is unreasonable." *Ante* at 10 n 10. Plaintiffs argue that the easement impermissibly severed the DNR's riparian rights from the land and claim that, because the easement benefits a nonriparian tract, it violates the requirement in *Thompson v Enz*, 379 Mich 667; 154 NW2d 473 (1967), that limits artificial riparian uses to those benefitting the riparian land itself.

Michigan law allows the DNR to grant Merit an easement to access Kolke Creek precisely because it does *not* operate to sever the DNR's underlying riparian rights from

19

A. REASONABLENESS OF EASEMENT AND PROPOSED DISCHARGE

Although plaintiffs have won at all levels below on the issue whether the *proposed* discharge would have violated their riparian rights, they challenge the underlying law that the lower courts applied to the analysis.[50] The lower courts applied the "reasonable use balancing test" as outlined in the Court of Appeals' *Nestlé* opinion. Plaintiffs claim that this was erroneous, first, because the *Nestlé* panel ignored or changed Michigan water law and, second, because the instant panel improperly extended *Nestlé*'s groundwater decision to competing *riparian* surface water claims.

The *Nestlé* "reasonable use balancing test" applies a multifactor balancing test to determine whether the alleged violation of a plaintiff's water rights (in *Nestlé*, groundwater rights, and in the instant case, surface riparian rights) amounts to an

the land. This Court's decision in *Thompson* is instructive inasmuch as it proves the *opposite* of plaintiffs' argument. *Thompson* involved a developer's attempt to divide a large parcel of land adjoining a lake into several smaller parcels, so that some of the newly created parcels no longer touched the lake. Nevertheless, the developer sought to maintain riparian rights on the parcels no longer touching the lake. The Court rejected this attempt, concluding that "riparian rights are not alienable, severable, divisible or assignable apart from the land which includes therein, or is bounded, by a natural water course." *Id*. at 686 (opinion by T. M. KAVANAGH, J.). However, *Thompson* also recognized that riparian rights could be granted by easement: "While riparian rights may not be conveyed or reserved[,] . . . easements, licenses and the like for a right-of-way for access to a water course do exist and ofttimes are granted to nonriparian owners." *Id.* Such an access grant is exactly what occurred here. The instant easement provided access to Kolke Creek, which included the right to dispose of treated water into Kolke Creek. The Court of Appeals correctly determined that "plaintiffs' argument does not hold water." *Anglers*, 283 Mich App at 132.

[50] Merit has not cross-appealed the lower courts' decisions that its proposed discharge violates plaintiffs' riparian rights, although it argues that the lower courts applied the appropriate test.

unreasonable infringement of those rights. The *Nestlé* panel defined the "reasonable use balancing test" as follows:

> While the nature of the balancing test requires that the appropriate factors be ascertained on a case-by-case basis, . . . several factors can be discerned that will be relevant to every application of the test. These factors include (1) the purpose of the use, (2) the suitability of the use to the location, (3) the extent and amount of the harm, (4) the benefits of the use, (5) the necessity of the amount and manner of the water use, and (6) any other factor that may bear on the reasonableness of the use.

> When determining the purpose of the use, the court should consider whether the use is for an artificial or a natural purpose and whether the use benefits the land from which the water is extracted. Natural purposes include all those uses necessary to the existence of the user and his or her family, including the use of the water for drinking and household needs. . . . Further, in order to ensure that the needs of local water users are met first, water uses that benefit the riparian land or the land from which the groundwater was removed are given preference over water uses that ship the water away or otherwise benefit land unconnected with the location from which the water was extracted.

> In assessing the suitability of the use to the location, the court should examine the nature of the water source and its attributes. A particularly large aquifer, stream, or lake may be unaffected even by extensive water withdrawals, whereas a marginal water resource may be unduly strained even by relatively modest withdrawals. . . .

> In assessing the harm and benefits, the court should examine not only the economic harm and benefits to the parties, but should also examine the social benefits and costs of the use, such as its effect on fishing, navigation, and conservation. . . .

> The court should also examine the extent, duration, necessity, and application of the use, including any effects on the quantity, quality, and level of the water. If the amount or method of water use is excessive or unnecessary and harms another's use, it will be unreasonable. Furthermore, if the harm caused by a water use can be readily modified to mitigate or

21

eliminate the harm, the failure to take such steps may make the particular use unreasonable.[51]

The lead opinion refuses to determine whether the *Nestlé* panel's "reasonable use balancing test" might be appropriate in some instances, but it conclusively determines this test to be inappropriate in the instant case because the proposed discharge was "manifestly unreasonable."[52] Although the lead opinion cautions that it is not concluding that "diverting water from one watershed to another is ipso facto unreasonable,"[53] it does provide a categorical rule regarding *contaminants* when it observes that "[i]t would be incongruous to hold that it is reasonable to decontaminate water by contaminating different water."[54] The categorical rule that the lead opinion fashions in its haste to render a decision in this case is inconsistent with longstanding principles of Michigan water law.

This Court's decision in *Attorney General ex rel Wyoming Twp v Grand Rapids*[55] provides a prime example of the lead opinion's determination—willful or not—to ignore longstanding principles of Michigan water law. *Wyoming Twp* is particularly significant because it employed a reasonable use balancing test under circumstances similar to the facts here. In *Wyoming Twp*, the plaintiff riparian owners sought to enjoin the defendant

---

[51] *Nestlé*, 269 Mich App at 71-74 (opinion by SMOLENSKI, J.) (citations omitted).

[52] *Ante* at 2.

[53] *Ante* at 13 n 18.

[54] *Ante* at 13.

[55] *Attorney General ex rel Wyoming Twp v Grand Rapids*, 175 Mich 503; 141 NW 890 (1913).

22

city—also a riparian owner—from discharging its citizens' sewage into the Grand River. It is clear from the facts of the case that many of the citizens whose land was therefore benefitted lived on nonriparian parcels. Further, as will often be the case when a governmental entity disposes of sewage, it is possible—and potentially likely—that citizens of the defendant lived on land *outside the watershed.* But such facts were irrelevant; the Court's decision rested entirely on a reasonable use test to balance the rights of the competing riparian owners to use the waterway as they saw fit.

Writing for the majority, Justice STONE applied a balancing test to determine the extent to which the plaintiffs' riparian rights suffered as a result of the defendant's discharge. The Court explained that "city has the right to make a reasonable use of the waters of the river as a riparian owner."[56] Accordingly, it articulated a rule that "where an *unreasonable* pollution of the water, *amounting to a nuisance, or impairing the rights of the lower riparian proprietor*, is created or maintained, an injunction will issue to restrain its continuance."[57]

The central issue was the plaintiffs' ability to exercise *their* riparian rights, not simply the defendant's pollution of the Grand River. The Court explained: "Sewage cannot be thrown into the stream *in such a way as to render the water foul and unfit for use.*"[58] It emphasized that *discharges of pollutants themselves* were not *per se*

---

[56] *Id.* at 534.

[57] *Id.* at 535 (emphasis added).

[58] *Id.* at 538 (emphasis added).

impermissible; only the harmful effect of a *particular* discharge rendered it impermissible:

> The maxim, "Use your own property in such a manner as not to injure that of another," can equitably be applied to the defendants in this case. It appears undisputed that the construction of a septic tank or tanks by the defendants within a reasonable time is feasible and practicable, and that thereby the sewage would be relieved from contaminating properties and so purified as to take away the offensive, unhealthful, and nauseating odors.[59]

Accordingly, the Court enjoined the defendant from discharging sewage "until the same shall have first been, by the use of a septic tank or tanks, so deodorized and purified as not to contain the foul, offensive, or noxious matter (which it now contains) *capable of injuring the complainants or their property, or causing a nuisance thereto . . . .*"[60]

The Court explicitly tied the reasonableness of a riparian discharge to the existence of a private nuisance. The two concepts are related because the existence of a private nuisance is *itself* dependent on whether the defendant's actions "'constitute unreasonable interference with the use and enjoyment of the land.'"[61] Overall, the Court's decision in *Wyoming Twp* shows not only that the *Nestlé* panel's "reasonable use balancing test" is firmly rooted in the Michigan common law, but also that such a test was applied historically even when a riparian owner used a waterway to benefit nonriparian lands. By contrast, the lead opinion's claim that *any* pollutant from a

---

[59] *Id.* at 543.

[60] *Id.* (emphasis added).

[61] *Adkins v Thomas Solvent Co*, 440 Mich 293, 305; 487 NW2d 715 (1992), quoting Prosser & Keeton, Torts (5th ed), § 87, p 623.

different watershed discharged into Kolke Creek is unreasonable per se is a sharp divergence from established Michigan water law.

Indeed, historical water law in Michigan consistently supports the lower courts' application of the "reasonable use balancing test" instead of the lead opinion's new categorical common law rule. Michigan riparian law dates to Justice COOLEY's 1874 decision in *Dumont v Kellogg*.[62] In *Dumont*, the defendant "constructed a dam across a natural water course, and by means thereof wrongfully detained the water in the stream to the prejudice and injury of the plaintiff, who was proprietor of a mill previously erected on the stream below."[63] The claim of error involved the trial court's instruction of the law to the jury, and so the Court articulated the proper law involving competing riparian claims. Justice COOLEY determined that equality of riparian ownership requires some sort of balancing of riparian interests:

> But as between different proprietors on the same stream, the right of each qualifies that of the other, and the question always is, not merely whether the lower proprietor suffers damage by the use of the water above him, nor whether the quantity flowing on is diminished by the use, but whether under all the circumstances of the case the use of the water by one is reasonable and consistent with a correspondent enjoyment of right by the other. "Each proprietor is entitled to such use of the stream, so far as it is reasonable, conformable to the usages and wants of the community, and having regard to the progress of improvement in hydraulic works, and not inconsistent with a like reasonable use by the other proprietors of land on the same stream above and below." . . . It is a fair participation and a reasonable use by each that the law seeks to protect. . . . It is therefore not a diminution in the quantity of the water alone, or an alteration in its flow, or either or both of these circumstances combined with injury, that will give a

---

[62] *Dumont v Kellogg*, 29 Mich 420 (1874).

[63] *Id.*

25

right of action, if in view of all the circumstances, and having regard to equality of right in others, that which has been done and which causes the injury is not unreasonable. In other words, the injury that is incidental to a reasonable enjoyment of the common right can demand no redress.[64]

This Court also articulated important principles involving riparian rights in *People v Hulbert*.[65] The central issue in *Hulbert* was whether, by swimming in the lake on which he owned property, the defendant criminally polluted the lake, which also served as a water supply to the city of Battle Creek. The prosecution presented expert witnesses who testified "that germs might have been thrown off the body of the respondent while swimming, which would produce disease, and that some of those germs might reach the intake pipe, and through it the consumers of the water, and be a source of ill health," even though "[i]t is not shown any such germs ever did reach the intake pipe, or that any illness in Battle Creek could be traced to the use of the water taken from this lake."[66]

Writing for the majority, Justice MOORE concluded that Michigan and foreign caselaw made it clear "that the lower proprietor [i.e., the city] has no superior right to the upper one, and may not say to him that, because the lower proprietor wants to use the water for drinking purposes only, the upper proprietor may not use the water for any other purpose."[67] Rather,

[e]ach proprietor has an equal right to the use of the stream for the ordinary purposes of the house and farm, even though such use may in some degree

---

[64] *Id.* at 423-425, quoting *Cary v Daniels*, 49 Mass (8 Met) 466, 476-477 (1844).

[65] *People v Hulbert*, 131 Mich 156; 91 NW 211 (1902).

[66] *Id.* at 159.

[67] *Id.* at 173.

lessen the volume of the stream, or affect the purity of the water. . . . This right is not affected by the fact that the lower proprietor is a municipality instead of an individual.[68]

The Court also implicitly required a fact-intensive balancing of the rights and effects of the riparian users:

> In what we have said we do not mean to intimate that an upper proprietor may convert his property into a summer resort, and invite large numbers of people to his premises for purposes of bathing, and give them the right possessed only by the riparian owner and his family. We are undertaking to decide only the case which is presented here.[69]

As this explication of Michigan water law shows, the lead opinion's creation of a categorical common law rule out of whole cloth is hasty and inconsistent with established water law. Believing that it is "unconscionable and destructive for this Court to determine that it is reasonable to spread dangerous contamination throughout Michigan,"[70] the lead opinion nevertheless would adopt a categorical rule *without requiring a finding that the contamination is, in fact, "dangerous" to the watershed at issue!* This is so because the circuit court *only* made an initial finding of fact that the *volume* of the proposed discharge (1.15 million gallons a day) could cause unreasonable harm to plaintiffs. It did not find that the treated water was harmful to Kolke Creek *regardless of* volume; to the contrary, the circuit court specifically ruled that "the parties' proximity to and use of the watercourse, as well as the *volume*, source, and nature of the proposed discharge, were considered while determining whether the proposed discharge

---

[68] *Id.*

[69] *Id.* at 174.

[70] *Ante* at 13.

would be reasonable." Furthermore, its decision expressly contemplated that defendants might offer a planned discharge of contaminant that *would* be reasonable. Instead of reviewing the factual determinations of the circuit court, the lead opinion makes a ruling as a matter of law that *any* amount of discharge is *per se* unreasonable. There is simply no basis in law or fact for its ruling.

Incredibly, the lead opinion reaches its preferred result by creating a new categorical rule *both* without citing a single case in support *and* with apparent unawareness that caselaw has *already established* how courts should weigh water use on the basis of whether it benefits riparian or nonriparian land, if the specific facts of a case warrant a distinction.[71] Citing longstanding precedent of this Court, the Court of Appeals panel in *Nestlé* expressly held that "water uses that benefit the riparian land . . . are given preference over water uses that . . . benefit land unconnected with the location [of the water withdrawal]."[72] A court should "ensure that the needs of local water users are met first . . . ."[73] Indeed, as the lower courts obviously concluded here, the factors listed in *Nestlé* directly address, on the basis of historical tests for reasonableness, each of plaintiffs' concerns about Merit's proposed water use. For example, *Nestlé* also asserted that "natural purposes," including "uses necessary to the existence of the user and his or

---

[71] The reasons underlying some courts' distinctions between riparian and nonriparian benefits would generally apply equally to any distinction between on-watershed and off-watershed uses. But, notably, the lead opinion's categorical new rule for off-*watershed* uses—as opposed to uses benefitting nonriparian lands, generally—appears drawn from thin air.

[72] *Nestlé*, 269 Mich App at 72.

[73] *Id.*

28

her family," take precedence over artificial uses.[74]  As is particularly relevant to plaintiff Anglers of the AuSable, Inc., a court must also consider the proposed use's "effect on fishing, navigation, and conservation."[75]  Finally, the circuit court's ruling clearly took into account the *Nestlé* panel's holdings that "[i]f the amount or method of water use is excessive or unnecessary and harms another's use, it will be unreasonable," and "if the harm caused by a water use can be readily modified to mitigate or eliminate the harm, the failure to take such steps may make the particular use unreasonable."[76]

The lead opinion's conclusion that Merit's proposed use is manifestly unreasonable simply because it involves two watersheds is unnecessary and displays a patent disregard for the rule of law and for this Court as an institution.  Its unreasoned conclusion also threatens vast negative consequences for the residents and businesses of this state.

## B.  POTENTIAL CONSEQUENCES OF THE LEAD OPINION'S RULE

With little explanation that cites no proposition of law, save the unremarkable and uncontested principle that an unreasonable use of a watershed is prohibited, the lead opinion upends water law and declares a categorical per se rule precluding any amount of contaminant into Kolke Creek.  The lead opinion attempts to bouleverse the existing law of this state, the negative impacts of which attempt cannot fully be foreseen.  It fails to

---

[74] *Id.* at 71-72.

[75] *Id.* at 73.

[76] *Id.* at 73-74 (citations omitted).

account even for several obvious hypothetical situations in which its unbending rule inappropriately precludes *reasonable* discharges that do not harm riparian owners' rights.

For example, suppose the presence of a contaminant in a small watershed causes significant harm to the environment and to the people living within that watershed. Suppose further that environmental engineers determine that diverting that contaminant to a large watershed (or several other watersheds) via riparian owners' access easements would not harm the water contained in the larger watershed because the contaminant is safe when diluted in a large body of water. In this situation, the diversion would not harm the riparian rights of the larger watershed's users, but it would significantly improve the environmental conditions of the smaller watershed. Nevertheless, the lead opinion's categorical rule would seem to provide riparian owners at the point of discharge a cause of action to enjoin the discharge, *despite no finding of harm to the larger watershed.*

The lead opinion also seems to call into question whether and to what extent municipalities can discharge their residents' sewage. Suppose that a municipality's residents receive their water from one watershed and that the municipality discharges its residents' sewage into a different watershed. May riparian owners at the point of discharge successfully enjoin the municipality from discharging its residents' sewage upon a simple showing that the discharge was created from water taken from a different watershed? Although the *Wyoming Twp* decision would allow this discharge (assuming a finder of fact were to make appropriate findings of reasonableness), the rationale of the lead opinion would forbid it.

30

Consider an even simpler scenario: may a farmer no longer import water during dry seasons to irrigate his crops if any amount of the water, once sprayed onto his land, will drain into a river? According to the rationale of the lead opinion, arguably he may not. It appears that it will not matter whether the farmer uses potentially damaging fertilizers or harmless organic ones—either would "contaminate" the water as it runs off the plants and soil—given that *actual* injury to the watershed from his irrigation is irrelevant under the lead opinion's categorical rule. Indeed, because the lead opinion never even defines "contamination," farmers are left to wonder: Is irrigation precluded if the off-watershed irrigation water is contaminated with mere soil? With plant matter? Further, because the lead opinion's rule makes it no longer appropriate to balance the benefits and detriments of the particular use in relation to other uses of the watershed, the categorical prohibition would not be superseded even if the farm were a significant source of food or economic support for the farmer's community.[77] Thus, the lead

---

[77] Significantly, we cannot assume that, even if the farmer's use does not *actually* injure the watershed or interfere with other riparian users, such hypothetical situations are irrelevant for the practical reason that no one will sue to enjoin the irrigation. To the contrary, a per se rule divorced from any factual inquiry into the nature and level of harm invites mischief, particularly when combined with the minimal test for standing established by the majority in *Lansing Sch Ed Ass'n*, 487 Mich 349, relied on by the lead opinion here. Under the prudential standing test from that case, any user of the watershed may seemingly sue our farmer for reasons unrelated to either party's water needs and in disregard of the needs of the community. Indeed, another watershed user could sue simply because that user is, for example, a farm operator wishing to reduce competition or even a vindictive riparian neighbor who disapproves of the farmer's choice in overalls; neither plaintiff would have to show that he was *actually* harmed by the farmer's irrigation.

31

opinion's rule has the potential to cripple agriculture in this state—an industry that has an economic impact of more than $70 billion annually in this state's economy.[78]

These are only a few hypothetical situations that the lead opinion's categorical rule would seem to forbid. Yet as these examples make clear, application of the lead opinion's rule—which requires water use to be enjoined on the basis of a vague notion of "contamination" instead of on the basis of relative harm—would stifle activity that simply does not harm existing watersheds and that is clearly beneficial to the community at large.

The lead opinion also fails to address arguments of defendants and their amici curiae—which raise additional critical concerns about the soundness and workability of the new rule—that on-watershed and off-watershed uses may be impossible to differentiate under some facts. The lead opinion's categorical rule suggests that a watershed's boundaries are sacrosanct, yet it has provided no authority for this principle. It does not even note Merit's related observation that its land—like countless other parcels in Michigan—sits nearly on the border of the surface water divide between the AuSable and Manistee watersheds, exemplifying Merit's argument that, as a matter of geographical fact, determining which watershed a parcel sits in is not always a black and white inquiry. Yet under the lead opinion's categorical rule, courts would have to make this determination, even when scientists and geographers cannot.

---

[78] Knudson & Peterson, *Second Interim Update on the Economic Impact of Michigan's Agri-Food and Agri-Energy System*, available at <http://www.productcenter.msu.edu/documents/2nd%20Interim%20Agri-Food%20Economic%20Impact.pdf> (accessed December 22, 2010).

Finally, and most telling, as explained earlier, plaintiffs *successfully* enjoined Merit from discharging 1.15 million gallons a day into Kolke Creek in the instant original action, and they *successfully* vacated the DEQ's COC on appeal of the contested case decision. Those proceedings were designed to take into account the very analyses that the lead opinion elides: namely, whether the particular proposed discharge would *unreasonably* interfere with plaintiffs' riparian rights and whether it would violate Michigan's environmental laws. This case's procedural history illustrates that the careful balance Michigan's riparian law has struck for more than a century serves citizens of this state, including riparian owners such as plaintiffs, well: not one drop of treated water has ever been allowed to enter the bodies of water plaintiffs sought to protect; the permit that would have allowed a discharge was vacated; *and* plaintiffs were awarded fees and costs pertaining to their claims against Merit. This litigation demonstrates that there is no need to disturb Michigan's balanced and effective riparian law. Ultimately, the broad strokes that the lead opinion uses in its haste to render its preferred policy decision in this case would severely damage this state's common law and its economy.

## V. PLAINTIFFS' MEPA CLAIMS

Plaintiffs claim that both Merit and the DEQ violated MEPA.[79] MCL 324.1701(1) provides, in whole:

---

[79] As stated in part III(B) of this opinion, plaintiffs' MEPA claims are now moot. Their MEPA claim against Merit is moot because Merit no longer has either physical access to Kolke Creek or a valid DEQ permit. Their MEPA claim against the DEQ is moot because the circuit court has already vacated the underlying permit. Nevertheless, the majority has decided to rule that plaintiffs' MEPA claims against Merit and the DEQ may

33

The attorney general or any person may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction.

MCL 324.1703(1) requires the plaintiff to make "a prima facie showing that the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources . . . ."

Plaintiffs claim that the DEQ's issuance of the COC "is likely to pollute, impair, or destroy" Kolke Creek and the AuSable River watershed in violation of MCL 324.1703(1).[80] The lower courts applied this Court's precedent in *Preserve the Dunes* to rule that the mere issuance of a permit is not itself "conduct" that "is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources" in violation of MCL 324.1703(1).

## A. *PRESERVE THE DUNES* WAS CORRECTLY DECIDED

In *Preserve the Dunes*, the plaintiff sought to enjoin a sand dune mining operation for which the DEQ had granted a permit. Although the plaintiff did not challenge the

---

proceed. Therefore, while I would dismiss the entire case as moot, my analysis proceeds on the substantive merits of the claims.

[80] Plaintiffs also claim that Merit's proposed discharge "is likely to pollute, impair, or destroy" Kolke Creek and the AuSable River watershed in violation of MCL 324.1703(1). The circuit court agreed with plaintiffs that the proposed discharge would violate MEPA and enjoined Merit from undertaking its proposed discharge. The Court of Appeals affirmed the injunction, and Merit has not appealed that decision of the Court of Appeals. Accordingly, this Court is not presented with the substantive question whether Merit's proposed discharge violates MEPA.

mining operation's eligibility for the permit during the appropriate time for review, it sought to undertake a *collateral attack* on the permit's issuance, claiming that the DEQ's mere issuance of the permit violated MEPA.

Writing for the majority, Justice CORRIGAN explained that, even if the DEQ had erred by issuing the permit, "[a]n improper administrative decision, standing alone, does not harm the environment. Only wrongful conduct offends MEPA."[81] Accordingly, the Court rejected the plaintiff's collateral attack on the issuance of the mining permit. Of course, the Court's holding that "[o]nly wrongful conduct offends MEPA" did nothing to prevent an action against the *mining operation* for harming the environment. Indeed, if nothing else, the opinion underscored that the appropriate avenue to enforce MEPA is to seek relief from the entities whose *actual conduct* violates or would imminently violate MEPA.

The lead opinion claims that *Preserve the Dunes* "frustrated the legislative intent behind MEPA, and . . . represented a departure from this Court's precedent."[82] To the contrary, *Preserve the Dunes* applied the language that the Legislature used in MEPA, and its holding was consistent with the holdings contained in this Court's earlier precedent.

When interpreting a statute, courts must "ascertain the legislative intent that may reasonably be inferred from the words expressed in the statute."[83] This requires courts to

---

[81] *Preserve the Dunes*, 471 Mich at 519.

[82] *Ante* at 7.

[83] *Koontz v Ameritech Servs, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002).

35

consider "the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.'"[84] In enacting MEPA, the Legislature specified that it was regulating "*conduct* of the defendant [that] has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources . . . ."[85]

The word "conduct" is not defined in MEPA, nor is it defined in the Natural Resources and Environmental Protection Act,[86] within which all environmental regulations, including MEPA, fall. "[W]e give undefined statutory terms their plain and ordinary meanings."[87] Accordingly, it is appropriate to use a dictionary to determine the appropriate meaning of the word "conduct" in MCL 324.1703(1).[88] *Merriam-Webster's Collegiate Dictionary* defines "conduct," in relevant part, as "the act, manner, or process of carrying on[.]"[89] This definition makes it clear that conduct requires some sort of action.

It is apparent from the placement of the term "conduct" within MCL 324.1703(1) that not only must a defendant engage in "conduct" to violate MEPA, but the defendant's

---

[84] *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999), quoting *Bailey v United States*, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995).

[85] MCL 324.1703(1) (emphasis added).

[86] MCL 324.101 *et seq.*

[87] *Koontz*, 466 Mich at 312.

[88] *Id.*

[89] *Merriam-Webster's Collegiate Dictionary* (1998).

conduct must *itself* "pollute[], impair[], or destroy[] or [be] likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources . . . ." It is simply not the case that the issuance of a permit, by itself, pollutes, impairs, or destroys or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources.[90] While a permit might precede conduct that pollutes, impairs, or destroys this state's environmental resources, it does not do so without subsequent action by an individual or entity. The lead and concurring opinions thus have not shown how the mere issuance of a permit violates MEPA.

The lead opinion also claims that *Preserve the Dunes* "insulate[s] DEQ permit decisions from MEPA."[91] As already demonstrated, this case is a perfect illustration that this is simply untrue. Judicial review of agency decisions is available through an appeal to circuit court pursuant to the Administrative Procedures Act (APA) after a contested case hearing.[92] In other words, a person seeking judicial review of an administrative agency's issuance of a permit may assert that the agency failed to apply MEPA. As discussed, that is precisely what happened in this case. In plaintiffs' appeal of the

---

[90] This conclusion is strengthened by a contextual reading of MEPA that considers the use of "conduct" in MCL 324.1705, which mandates that an agency make a pollution determination, and then states that "*conduct* shall not be authorized or approved that has or is likely to have [a polluting] effect . . . ." MCL 324.1705(2) (emphasis added). This provision recognizes a distinction between the "conduct" of a MEPA defendant and the "authorization" or "approval" of the agency. Thus, the language of the statute makes clear that the drafters of MEPA did not consider authorization or approval alone to constitute "conduct," just as *Preserve the Dunes* held.

[91] *Ante* at 10.

[92] MCL 24.302.

37

contested case decision, the circuit court concluded that the DEQ's "approval of Merit's COC is illegal . . . because the proposed discharge and the proposed volume of discharge is likely to violate MEPA."

Accordingly, contrary to the lead opinion's unsupported assertion, the permitting process is far from "insulated." In this very case, MEPA was vindicated through an appropriate and entirely adequate procedural vehicle: the APA appeal. There was no need for plaintiffs to file a separate complaint under MCL 324.1701, alleging *again* that the MDEQ's issuance of the (already-invalidated) COC violated MEPA. As the procedural history of this case illustrates, and as *Preserve the Dunes* recognized, a MEPA case challenging the issuance of a permit constitutes an improper "collateral attack" that is nowhere contemplated by the statute.[93]

## B. *PRESERVE THE DUNES* WAS CONSISTENT WITH THIS COURT'S PRECEDENT

The lead and concurring opinions also have not shown how *Preserve the Dunes* departed from this Court's precedent. The lead and concurring opinions both refer to several cases that they urge support their claim, but they fail to examine those cases in sufficient detail to show how they are inconsistent with *Preserve the Dunes*. In fact, the cases cited provide little support for the claim that *Preserve the Dunes* was incorrectly decided.

---

[93] *Preserve the Dunes*, 471 Mich at 511.

First, the lead and concurring opinions refer to *Eyde v Michigan*.[94] However, the plaintiffs in *Eyde* claimed that "the construction of a sewer [was] violative of" MEPA's predecessor statute.[95] Thus, *Eyde* unquestionably involved conduct, namely, the construction of a sewer. Moreover, the Court expressly indicated that its holding was "restricted to the unique facts of this case."[96] As a result, the lead and concurring opinions' reliance on this case is specious.

Second, the lead and concurring opinions refer to *Ray v Mason Co Drain Comm'r*.[97] *Ray* involved "the kind of findings of fact required of the trial judge . . . in deciding an action brought under" MEPA's predecessor statute.[98] *Ray* neither involved nor discussed whether the mere issuance of a permit can itself violate MEPA. Accordingly, it is simply irrelevant to the position that the lead and concurring opinions seek to advance.

Third, the lead and concurring opinions refer to *West Mich Environmental Action Council v Natural Resources Comm* (*WMEAC*).[99] The plaintiffs in *WMEAC* challenged a consent order between the Natural Resources Commission (NRC) and several private

---

[94] *Eyde v Michigan*, 393 Mich 453; 225 NW2d 1 (1975).

[95] *Id.*

[96] *Id.* at 456.

[97] *Ray v Mason Co Drain Comm'r*, 393 Mich 294; 224 NW2d 883 (1975).

[98] *Id.* at 298.

[99] *West Mich Environmental Action Council v Natural Resources Comm*, 405 Mich 741; 275 NW2d 538 (1979) (*WMEAC*).

entities to allow oil and gas development in a state forest. Pursuant to that consent order, the NRC granted permits for those private entities to drill 10 exploratory wells in the forest. Even before the NRC granted those permits, however, the plaintiffs claimed that the consent order "was likely to lead to the impairment of wildlife in the Forest."[100] This Court's ultimate disposition was to order the trial court to enter "a permanent injunction prohibiting the drilling of the ten exploratory wells pursuant to permits issued on August 24, 1977."[101] Thus, this Court's injunction was not issued to enjoin the NRC from *issuing* permits or even to *vacate* the existing permits but to enjoin the *underlying conduct* that the permits purported to allow. *WMEAC* is, therefore, inapplicable to whether *Preserve the Dunes* was correctly decided.

Finally, the lead and concurring opinions refer to *Nemeth v Abonmarche Dev, Inc.*[102] *Nemeth* involved a proposed development in the city of Manistee that the plaintiffs alleged would cause soil and sand erosion. At issue in *Nemeth* was whether the developers' (undisputed) violations of the soil erosion and sedimentation control act (SESCA)[103] also violated MEPA. This Court concluded that substantive SESCA violations can present a prima facie MEPA violation. Thus, *Nemeth* similarly involved whether conduct underlying a permit—not the actual issuance of a permit—violates MEPA.

---

[100] *Id.* at 750.

[101] *Id.* at 760.

[102] *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16; 576 NW2d 641 (1998).

[103] MCL 324.9101 *et seq.*

Accordingly, and contrary to the lead and concurring opinions' ipse dixit, *Preserve the Dunes* was not inconsistent with this Court's prior holdings.

## C. THE LEAD OPINION'S ADDITIONAL RATIONALES

The lead opinion claims that it provides two additional "compelling justifications for overruling *Preserve the Dunes*."[104] Neither of these justifications withstands scrutiny.

First, the lead opinion claims that *Preserve the Dunes* violates article 4, § 52 of the Michigan Constitution, which indicates that the "conservation and development of the natural resources of the state . . . [are] of paramount public concern" and that "[t]he legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction."[105]

This Court has recognized that the predecessor statute of MEPA was "the first legislation of its kind" and that its passage "attracted worldwide attention."[106] Nothing in *Preserve the Dunes* prevented any plaintiffs who alleged an imminent injury to their property from participating in what former Chief Justice WILLIAMS called "the important task of environmental law enforcement . . . ."[107] Indeed, plaintiffs here have *already succeeded* in enforcing MEPA by receiving an injunction preventing Merit from undertaking conduct that the circuit court concluded would violate MEPA. *Preserve the*

---

[104] *Ante* at 8.

[105] Const 1963, art 4, § 52.

[106] *Ray*, 393 Mich at 304.

[107] *Id.* at 305.

41

*Dunes* did not stifle enforcement of MEPA. On the contrary, it focused enforcement of MEPA against those individuals and entities who are actually harming, or whose imminent conduct threatens to harm, this state's natural resources.[108]

The lead opinion also determines that *Preserve the Dunes* should be overruled because, in the instant case, the DEQ "has done more than simply issue a permit that would result in the harm of natural resources" because it "has also granted an easement over state land to facilitate the harmful actions."[109] It is simply incongruous to assert that the holding in *Preserve the Dunes*—that the mere issuance of a permit does not constitute "conduct"—should be overruled because the lead opinion concludes that the DEQ's actions in the instant case exceeded the mere issuance of a permit! Indeed, nothing in *Preserve the Dunes* prohibited actions against administrative agencies whose conduct *actually* pollutes or threatens to pollute the environment. Moreover, the lead opinion is simply incorrect in stating that the DEQ granted Merit an easement to facilitate its allegedly harmful actions. The DNR granted the easement to Merit, not the DEQ. Although today they are within the same entity (the Department of Natural Resources and

---

[108] The lead opinion's holding has the opposite effect in that it arguably makes countless individuals and entities subject to MEPA claims, even when their "conduct" *itself* does not harm the environment. The lead opinion reasons that the DEQ is subject to a MEPA claim because its "permit process is entirely related to the environmental harm . . . ." *Ante* at 7. However, the lead opinion provides no guidance as to what nexus would be sufficient to satisfy its "entirely related" test. Should the bank that makes the loan for a building project on wetlands be subject to a MEPA suit? Should the contractor who supplies the labor? Should the builders themselves be? Certainly, by the lead opinion's reasoning, all of these individuals' "conduct" is "entirely related" to a harm, or to a likely harm, to the environment.

[109] *Ante* at 9.

Environment), they were separate executive agencies at the time the easement was granted. Thus, to the extent that the DNR's act of granting the easement arguably can be said to have been actionable "conduct" violating the relevant environmental statutes, this is not related to DEQ's issuance of the permit. But this circumstance is not a problem for the lead opinion. Simply put, the lead opinion's argument that the issuance of the successfully challenged permit caused an environmental injury is specious.

## D. STARE DECISIS PRINCIPLES MILITATE AGAINST OVERRULING *PRESERVE THE DUNES*

Not only does a majority of this Court erroneously conclude that *Preserve the Dunes* was incorrectly decided and was inconsistent with this Court's precedent, but the lead and concurring opinions do not seriously consider what effect the principle of stare decisis has on whether to overrule *Preserve the Dunes*. Stare decisis "'promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.'"[110]

Although the lead and concurring opinions (erroneously) conclude that *Preserve the Dunes* was wrongly decided, it is well established that "the mere fact that an earlier case was wrongly decided does not mean overruling it is invariably appropriate."[111] Instead, this Court must determine the effects of overruling its prior decision, "including

---

[110] *Robinson v Detroit*, 462 Mich 439, 463; 613 NW2d 307 (2000), quoting *Hohn v United States*, 524 US 236, 251; 118 S Ct 1969; 141 L Ed 2d 242 (1998).

[111] *Robinson*, 462 Mich at 465.

43

most importantly the effect on reliance interests and whether overruling would work an undue hardship because of that reliance."[112]  The lead opinion simply states, with no explanation, that "the law must be returned to how it was applied before *Preserve the Dunes* was incorrectly decided."[113]  The lead opinion's failure to undertake this analysis with any degree of seriousness further illustrates its haste to render a decision.

In fact, the lead opinion fails to make this analysis because such an analysis shows that *Preserve the Dunes* should be maintained.  To overrule *Preserve the Dunes*, even if it were wrongly decided, "would produce chaos."[114]  The *Preserve the Dunes* majority's response to the dissent in that case provides a glimpse into the world the lead opinion seeks to create, one in which no administrative decision achieves finality:

> Imagine the world that the dissent's reasoning would create.  The present energy crisis offers a good example.  For many years, our country has sought to decrease our reliance on foreign sources of oil.  Suppose an oil company decided to invest in oil exploration in Michigan in reliance on a DEQ-issued permit.  Under the dissent's view, MEPA would authorize a challenge at any time to flaws in the permitting process.  Moreover, under the dissent's reasoning, a court must accept as true the bare assertion that a company's conduct will destroy natural resources.  It can never rely on a permit to do business.  What sane investor would take such a risk?  As gas prices soar, few people in Michigan would thank this Court for "protecting" the environment in this radical fashion.
>
> The dissent's regime would render the permitting process a useless exercise.  It would cripple economic expansion in Michigan and probably lead to disinvestment.  No one would invest money to obtain a permit that is subject to endless collateral attacks.

---

[112] *Id.* at 466.

[113] *Ante* at 10 n 9.

[114] *Robinson*, 462 Mich at 466 n 26.

44

> MEPA nowhere strips the permitting process of finality. It is the dissent that makes a mockery of legislative intent by failing to anchor its exaggerated claims in the statute's actual language. MEPA does not impose the radical requirement that courts indefinitely police administrative agencies' permit procedures and decisions.[115]

The lead opinion's rationale, such as it is, provides scant assurance that it has considered how disruptive overruling *Preserve the Dunes* will be to this state.

The concurring opinion attempts to undertake an analysis of stare decisis principles, but it also falls short of proving that *Preserve the Dunes* should be overruled. In particular, the lead and concurring opinions have not shown how *Preserve the Dunes* defies "practical workability," another factor militating against its claim that *Preserve the Dunes* should be overruled.[116] To the contrary, even under *Preserve the Dunes*, the instant plaintiffs *successfully enjoined* the conduct that the DEQ's permit purported to allow and they *successfully challenged* the issuance of that permit on appeal from the appropriate administrative procedures. Indeed, if anything, this case shows how *Preserve the Dunes* appropriately and effectively interpreted Michigan's environmental law, permitting the successful protection of the environment and plaintiffs' riparian rights. This fact alone should have been persuasive to any jurist committed to stare decisis to avoid an unnecessary overruling of existing precedent.

*Preserve the Dunes* was correct when it was decided, and it remains correct today. The lead and concurring opinions have not provided any serious reason for determining otherwise.

---

[115] *Preserve the Dunes*, 471 Mich at 523.

[116] *Robinson*, 462 Mich at 466.

45

## VI. CONCLUSION

This case is moot. Not only has Merit voluntarily abandoned the easement that granted it physical access to Kolke Creek, the circuit court has also vacated the underlying DEQ permit that would have allowed it to make its proposed discharge. Accordingly, any substantive decision that this Court renders only affects the parties in the abstract. This Court has long stated that it is not a constitutional exercise of the judicial power to decide abstract cases. Therefore, I vehemently dissent from this Court's decision to render a substantive ruling in this case.

Furthermore, I strongly dissent from the lead opinion's unnecessarily disruptive disposition of the substantive issues in this case. The lead opinion fashions out of whole cloth a categorical rule that "contaminated" water originating from one watershed can never be discharged into watercourses in another watershed because such a discharge inherently violates the riparian rights of landowners at the point of discharge. This decision has no basis in Michigan's well-established water law, under which the touchstone of "reasonableness" has served the citizens of this state, including these riparian plaintiffs, very well. Finally, the lead and concurring opinions' claim that *Preserve the Dunes* was wrongly decided is inconsistent with the plain language of MEPA and will wreak havoc on this state's legal system.

In short, the lead opinion's palpably erroneous decision and the concurring justices' acquiescence in the result of that decision are affronts to the rule of law and reflect the majority's unseemly haste to render a decision in this case before the end of calendar year 2010. The decision this Court renders today is a prime example of the

46

naked exercise of power without constitutional warrant. While there may be some who will welcome today's result, they should fear a judiciary that is willing to bend the law to accomplish its will. Those who support it may live to see this decision further undermine the state's fragile economy.

For all the foregoing reasons, I respectfully, but strenuously, dissent.

Robert P. Young, Jr.
Maura D. Corrigan
Stephen J. Markman